**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| STEPHEN N. DURBIN, )<br>     )<br>     Plaintiff, )<br>     )<br>     v. )<br>     )<br>CAROLYN W. COLVIN, )<br>COMMISSIONER OF )<br>SOCIAL SECURITY, )<br>     )<br>     Defendant, ) | No. 12-cv-3339 |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Stephen B. Durbin appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Durbin filed a Motion for Summary Judgment (d/e 8), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 11). This matter has been referred for a Report and Recommendation. Text Order entered May 29, 2014. For the reasons set forth below, the

decision of the Commissioner should be reversed and remanded for further proceedings pursuant to 42 U.S.C. § 405(g) sentence four.

## STATEMENT OF FACTS

Durbin was born on October 2, 1964.  Answer to Complaint (d/e 6), attached Certified Copy of Transcript of the Record of Proceedings Before the Social Security Administration (R.), at 32.  He previously worked as a salesman in the agricultural industry.  He completed two years of college courses through his work.  R. 34.  Durbin last worked December 23, 2002. R. 36.  Durbin stopped working because he had been injured in an accident in which a piece of heavy agricultural machinery, a sprayer, had rolled over onto him.  Thereafter, Durbin suffered from a seizure disorder, anxiety disorder with panic attacks, posttraumatic stress disorder (PTSD), and obesity.  R. 14, 36, 38, 311.

On February 15, 2006, Durbin saw Dr. Claude Fortin. M.D.  Durbin reported having one seizure per week.  R. 361.  On March 9, 2006, Durbin saw Dr. David Kiel, M.D., for problems with seizures.  Durbin reported that his right face and lips were numb and tingly and he had some drooping of his right eyelid.  Dr. Kiel was unsure of the source of the problem.  He planned continued observation and a follow-up in one to three days.

R. 359.  On March 14, 2006, Durbin again saw Dr. Kiel. Dr. Kiel reported numbness and tingling around Durbin's lips extending up into the right cheek and orbit area. R. 357.  On April 8, 2006, Durbin again saw Dr. Kiel. Dr. Kiel reported right facial paresthesia on the right lower cheek in both lips radiating across the midline.  R. 356.

On April 19, 2006, Durbin saw Dr. Fortin again.  Dr. Fortin reported that Durbin was still having partial complex seizures which were inadequately controlled.  R. 355.  On May 18, 2006, Durbin again saw Dr. Fortin.  Dr. Fortin reported that Durbin complained of right hand and face numbness and tingling, with weakness of the right hand.  R. 352. On July 7, 2006, Durbin saw Dr. Fortin.  Durbin reported having seizures once a week with loss of consciousness.  Durbin reported some numbness and tingling in his right arm along with weakness.  Durbin also reported facial numbness and chin numbness.  Durbin described the numbness as constant for the past three months, but without any effect on the tongue. Durbin was losing strength in his right arm.  R. 350.

On May 8, 2006, Durbin saw his treating psychiatrist, Dr. Obul Reddy, M.D.  Dr. Reddy's notes reported that Durbin was "doing good."  The notes

also indicated that Durbin had been on Geodon for four years. The notes stated that Durbin was "pooped out." R. 389.[1]

On June 5, 2006, Durbin saw Dr. Reddy again. Durbin reported that he was still having seizures, and had a seizure that morning. R. 390. On June 19, 2006, Durbin saw Dr. Reddy. At this time Dr. Reddy noted that Durbin was "goofy." R. 390.

On July 7, 2006, Durbin saw Dr. Reddy. Durbin reported that he had seen Dr. Fortin that morning. Durbin reported he was still having seizures. R. 391.

On August 21, 2006, Durbin saw Dr. Reddy. Durbin reported that he had been in the hospital for tests. He reported he had a couple of panic attacks. Durbin reported that things were going well and that Dr. Fortin had prescribed Provigil for his seizures. R. 392.

On August 24, 2006, Durbin saw Dr. Fortin because of refractory seizures. R. 383. Dr. Fortin conducted a video electroencephalogram (Video EEG). Durbin reported daily syncopal episodes which resulted in loss of consciousness and falling to the floor. Durbin's mother witnessed these episodes, but denied any tonic-clonic activity, incontinence or tongue biting. R. 384. Durbin had normal strength and tone with intact extraocular

---

[1] Dr. Reddy's notes are handwritten and very difficult to read. As a result the parties and the Court can only decipher a few of the words in the notes of each session.

movements and no evidence of hystagmus.  R. 384. The Video EEG showed refractory syncopal episodes, differential including partial complex seizures, pseudoseizures, and sleep attacks from sleep apnea.  R. 384.

On October 16, 2006, Durbin saw Dr. Reddy.  Dr. Reddy noted that Durbin's mood was stable.  Durbin reported to Dr. Reddy that he still had seizures.  Durbin said that he would pass out during the seizure and would be done for the day.  He reported being weak and dizzy.  R. 394.  On October 30, 2006, Durbin again saw Dr. Reddy.  Durbin reported that he was still passing out. R. 394.

On November 13, 2006, Durbin saw Dr. Reddy.  Durbin reported that he was still passing out one to two times per week.  R. 395.  On November 27, 2006, Durbin saw Dr. Reddy.  Durbin reported that he had a stroke and was hospitalized.  R. 395.

On December 11, 2006, Durbin saw Dr. Reddy.  Durbin reported he was not sleeping during the day.  He reported that he had a panic attack the night before.  He also reported that he was off Provigil.  R. 395.

On December 20, 2006, Durbin saw Dr. Fortin.  Durbin reported that the spells were not improved by taking Provigil.  Durbin further reported that he continued to refrain from driving due to the continued spells. R. 335.

On January 8, 2007, Durbin saw Dr. Reddy. Durbin reported that he was using the continuous positive air pressure (CPAP) machine to sleep and was doing well. Durbin reported that his strength was coming back. R. 396.

On February 5, 2007, Durbin saw Dr. Reddy. Durbin reported that he was doing well, but was still passing out. He reported that he recently had a panic attack. R. 396. On March 5, 2007, Durbin saw Dr. Reddy. Durbin reported that he was "doing good." R. 397. Durbin further reported he had not driven for three years. R. 397. On March 30, 2007, Durbin again saw Dr. Reddy. Durbin reported that he was still having seizures. Durbin reported he had one the night before. Durbin, however, reported that he was doing well on his medications. R. 397.

On May 7, 2007, Durbin saw Dr. Reddy. Dr. Reddy noted that Durbin was "doing wonderful." Durbin reported that he was still having seizures. Durbin reported that he had slept well the night before. Dr. Reddy noted "no depression." R. 398.

On June 4, 2007, Durbin saw Dr. Reddy. Durbin reported that he was still having seizures. Dr. Reddy noted that Durbin had suffered symptoms from depression and PTSD in the last week. Dr. Reddy noted

that Durbin suffered from sweats and panic attacks when around crowds. R. 398.

On July 2, 2007, Durbin saw Dr. Reddy. Dr. Reddy's notes stated, "Very little seizures, doing well." R. 399.

On October 1, 2007, Durbin saw Dr. Fortin. Durbin reported continuing to have spells one to two times per week. Durbin reported that his sleep had greatly improved since he started using the CPAP machine with oxygen. He reported he had much less daytime fatigue. R. 319. On October 2, 2007 Durbin saw Dr. Kiel. Durbin reported to Dr. Kiel that he was still having "drop attacks" two to three times per week. R. 315.

On December 5, 2007, Durbin saw Dr. Fortin. Dr. Fortin reported that Durbin had suffered blunt head trauma five years earlier. He developed PTSD following this incident. He also gained 100 pounds since the incident. Dr. Fortin also noted that Durbin started having syncopal episodes three weeks after the incident. Dr. Fortin stated the syncopal episodes were "likely to be sleep attacks from underlying sleep disorder." R. 311.

On July 14, 2008, Durbin saw Dr. Fortin. Durbin reported experiencing two to three seizures per week, with the last seizure occurring the week before. Durbin reported that his medication Provigil improved his

fatigue, but not his sleep ataxia seizures. Dr. Fortin diagnosed hypogonadism, seizure disorder, obstructive sleep apnea, and generalized anxiety. Dr. Fortin prescribed Methylphnenidate. R. 301-02.

On April 14, 2009, Durbin saw Dr. Reddy. Dr. Reddy noted severe problems with depression. Dr. Reddy noted that Durbin was nervous. R. 406.

On May 16, 2009, Durbin saw Dr. Reddy. Dr. Reddy reported that Durbin was given four nerve pills to calm down. R. 406. On June 1, 2009, Durbin saw Dr. Reddy. Dr. Reddy's notes indicated that Durbin was "doing good." R. 406. On June 29, 2009, Durbin saw Dr. Reddy. Durbin reported tightness in his chest. Durbin also reported that he was exercising and losing weight. Dr. Reddy noted that Durbin was "doing good." R. 406.

On July 8, 2009, Durbin saw Dr. Kiel. Dr. Kiel diagnosed Durbin with cardiomegaly, hypertension, hyperlipidemia, and type II diabetes mellitus. R. 291. Dr. Kiel continued Durbin's medications and instructed him to follow up with Dr. Reddy for his psychiatric medications. R. 291.

On July 28, 2009, Durbin saw Dr. Reddy. Durbin reported that Geodon helped. Durbin reported he was sleeping better. Dr. Reddy noted, "remains disabled/passing out spells are no different." R. 407.

On September 22, 2009, Durbin saw Dr. Reddy. Dr. Reddy noted that Durbin was "doing good." Dr. Reddy noted that Durbin's nervousness was managed and his panic attacks were controlled. R. 407.

On November 23, 2009, Durbin saw Dr. Reddy. Durbin reported that he did not need to take an extra Ativan. Dr. Reddy wrote that Durbin's dysphoria had improved. Dr. Reddy wrote the term "energetic." R. 408.

On January 6, 2010, Durbin saw Dr. Kiel. Dr. Kiel noted that Durbin was doing remarkably well. Durbin reported doing well on his medications and was walking three to four miles a day. R. 289.

On January 11, 2010, Durbin saw Dr. Reddy. Dr. Reddy reported that Durbin was doing well. Dr. Reddy reported that Durbin took an extra nerve pill at the time. R. 408. On February 12, 2010, Durbin saw Dr. Reddy. Dr. Reddy reported that Durbin was doing well and feeling better. Durbin reported that his anxiety was up. Durbin reported that he was trying to exercise more. He reported that he was walking three miles a day. R. 409.

On March 12, 2010, Durbin saw Dr. Reddy. Dr. Reddy's report noted that Durbin was doing "pretty good." Dr. Reddy noted that Durbin reported that he was not walking and woke up with tremors. Durbin reported that

the Ativan was helping. Durbin also reported that the Geodon was "doing pretty good." R. 409.

On March 21, 2010, Durbin filled out a Function Report-Adult form (Function Report). R. 228-36. Durbin reported he was divorced and lived in a house with his family. He reported he took care of his 17-year-old daughter. He also stated that his daughter helped him with his normal daily activities. He and the daughter took care of a dog. He reported that he sometimes took the dog outside. The daughter, however, took care of the dog most of the time. R. 228-29.

Durbin reported on the Function Report that his sleep was affected by sleep apnea. Durbin reported that he could dress himself and take care of his personal hygiene. He reported that his daughter had to remind him to shave and take a shower. Durbin reported that he could prepare simple meals such as sandwiches. He stated he did not prepare food often. He stated that he used to cook all the time, but stopped because he once had a seizure while cooking. As a result of the seizure, he pulled a hot skillet onto the floor beside him. R. 229-30.

Durbin stated on the Function Report that he did not do housework. He stated he did not do yard work. He stated his doctor was afraid he would have a seizure and hurt someone if he tried to do yard work. Durbin

stated he went outside every day.  He stated he traveled by walking, driving and riding in a car.  Durbin reported that he went shopping about once a month.  Durbin described his hobbies as watching TV and sitting with his family at his camper.  He reported that he engaged in these activities every day.  About three times a week, he visited with his family along with his mother and his children.  He reported that he avoided crowds.  R. 230-31.

Durbin reported on the Function Report that his panic attacks limited his ability to complete tasks, follow instructions, and get along with others.  He also reported that the panic attacks affected his concentration and understanding.  He reported that he could only pay attention for a short period of time.  He did not follow written or oral instructions well.  Both written and oral instructions caused him to have panic attacks.  He reported that he had problems with crowds, traffic, and "close places."  R. 232-34.

On April 9, 2010, Durbin saw Dr. Reddy.  R. 460. He reported sleeping well with Geodon.  R. 460.  Durbin asked if the Geodon dosage could be increased in the morning.  Dr. Reddy increased the dosage.  Durbin reported that his medications were working and that he went to the lake with his children.  Durbin's mood was good.  R. 460.

On April 12, 2010, Dr. Reddy completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment

form. R. 414-23.  These are standard forms used by state agency reviewers to evaluate disability applicants.   Part of the form evaluates whether a person is so significantly impaired he would be deemed disabled without regard to his age, education, or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 Listing of Impairments.  Each impairment identified in the Listing of Impairments is referred to as a "Listing."

The Psychiatric Review Technique form focused on Listings that concerned mental disorders.  Dr. Reddy opined that Durbin's mental conditions met the Listing for affective disorders, Listing 12.04.  R. 414. Dr. Reddy opined that Durbin had a mood disorder accompanied by a full or partial manic or depressive syndrome.  R. 415.  Dr. Reddy further opined that Durbin had an anxiety disorder.  R. 417.  The Listing for anxiety disorders is 12.06.

To meet either Listing 12.04 or 12.06, the claimant must have a recognized condition, such as depression or anxiety disorder.  This is referred to as the Paragraph A requirement.  In addition, the claimant must

meet the requirements of either Paragraph B or Paragraph C of these Listings.

Paragraph B requires the claimant's mental condition to result in two of four effects:

> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration;

Listing 12.04(B); Listing 12.06(B).

Paragraph C requires a medical history of severe functional limitations as follows:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.04(C); Listing 12.06(C). Dr. Reddy opined that as a result of Durbin's mental conditions, Durbin met all the requirements of both Paragraphs B and C. R. 419-20.

The Mental Residual Functional Capacity Assessment Form asks the evaluator to rate the effect of a claimant's mental condition on his functional abilities. The form contains a list of functional categories that could be affected by mental impairments. Dr. Reddy opined on this form that Durbin was moderately limited in his abilities in the following two categories:

to remember locations and work-like procedures; and

to understand and remember very short and simple instructions.

Dr. Reddy opined further that Durbin was markedly limited in his abilities in approximately eighteen categories:

to understand and remember detailed instructions;

to carry out very short and simple instructions;

to carry out detailed instructions;

to maintain attention and concentration for extended periods;

to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

to sustain an ordinary routine without special supervision;

to work in coordination with or in proximity to others without being distracted by them;

to make simple, work-related decisions; to complete a normal workday and workweek without interruptions;

to perform at a consistent pace without an unreasonable number and length of rest periods;

to interact appropriately with the general public;

to ask simple questions or request assistance;

to accept instructions and respond appropriately to criticisms from supervisors;

to get along with coworkers;

to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;

to respond appropriately to changes in work setting;

to be aware of normal hazards and take appropriate precautions;

to travel in unfamiliar places or use public transportation; and

to set realistic goals or plans independently of others.

R. 421-22. Dr. Reddy stated at the end of the form, "panic attack-can't drive-family drives him out of town-chronic anhedonia marked obesity-

HTN/early D. M. limited education very poor coping skills-impairment has lasted more than 8-10 years." R. 423.[2]

On April 25, 2010, state agency psychiatrist Dr. Elizabeth Kuester, M.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. R. 424-41. Dr. Kuester opined that Durbin suffered from an anxiety disorder, but his disorder did not meet any Listing. R. 424. Dr. Kuester opined that Durbin's medically determinable mental impairments were generally well controlled with medication. R. 429.

Dr. Kuester opined that Durbin's mental condition did not meet the requirements of Paragraphs B or C of Listings 12.04 or 12.06. Dr. Kuester opined that Durbin had mild restrictions in activities of daily living and maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. R. 434. Dr. Kuester found no evidence that Durbin met any part of Paragraph C.

Dr. Kuester opined on the Mental Residual Functional Capacity Assessment form that Durbin was moderately limited in his abilities in six categories:

---

[2] The initials "D.M." appear to stand for diabetes mellitus.

to understand and remember detailed instructions;

to carry out detailed instructions;

to maintain attention and concentration for extended periods;

to work in coordination with or in proximity to others without being distracted by them;

to complete a normal workday and workweek without interruption and to perform at a consistent pace without an unreasonable number and length of rest periods; and

to interact appropriately with the general public.

R. 438-39.  Dr. Kuester opined that Durbin's mental condition caused no other significant effects on his ability to work.  Dr. Kuester stated at the end of her assessment that Durbin could learn and perform simple, routine tasks with ordinary supervision, should avoid dealing with the public, could make basic work decisions, and should be able to cope with work demands.  R. 440.

On April 28, 2010, state agency physician Dr. Marion Panepinto, M.D., prepared a Physical Residual Functional Capacity Assessment form. R. 442.  Dr. Panepinto opined that Durbin had no physical limitations except for the need to avoid concentrated exposure to hazards such as

machinery or unprotected heights.  Dr. Panepinto included the restriction on exposure to hazards due to Durbin's history of seizures.  R. 442-46.

On May 17, 2010, Durbin saw Dr. Kiel.  R. 452.  Durbin reported lower back pain and acute periodontitis.  Durbin reported his back would lock up if he lifted something too heavy and he would occasionally get shooting pains in one or both legs if he moved or twisted the wrong way while walking.  Durbin said the pain would usually subside within three to four days.  Durbin stated overall he was doing fairly well.  R. 452.  Dr. Kiel diagnosed acute periodontitis and lower back pain.  Dr. Kiel prescribed stretching techniques, ice and heat therapy, as well as ibuprofen.  R. 452.

July 14, 2010 Durbin underwent an MRI of his lumbar spine. The MRI showed mild degenerative disc disease at L4/L5 and L5/S1, with central L4/L5 and left paracentral and foraminal L5/S1 disc protrusions.  R. 473-74.

On July 22, 2010, state agency psychologist Dr. Michelle Womontree, Psy.D., affirmed Dr. Kuester's opinions.  R. 469.  On July 26, 2010, state agency physician Dr. Towfig Arjmand, M.D., affirmed Dr. Panepinto's opinions.  R. 469.

On August 6, 2010, Durbin saw Dr. Reddy.  Durbin reported that he lacked energy, had six bulging discs in his back, and continued to have depression and seizures.  Dr. Reddy assigned Durbin a Global Assessment

of Functioning (GAF) score of 39.[3]  Dr. Reddy noted at the bottom of his notes for the day "permanently disabled."  R. 481.

August 18, 2010, Durbin saw Dr. Kiel again.  Dr. Kiel noted that Durbin "had not been seen for a while for his recurring spells which were thought to be related to sleep abnormality and hypersomnia with a negative work up for seizures."  R. 514.  Dr. Kiel noted that Durbin was "now having them again about every three weeks."  R. 514.  Dr. Kiel stated that the seizures did not respond to Provigil or Ritalin in the past.  R. 514.

On September 24, 2010, Durbin saw Dr. Reddy.  Durbin reported that he had "been good," but was worried and preoccupied about his back. R. 482.  Durbin reported that his back trouble kept him from walking. Durbin reported everything had been going well, his medications had been working well, and he was sleeping "good" through the night.  R. 482. Dr. Reddy found that Durbin was alert and fully oriented with no evidence of active depression or hallucinations, delusions, or suicidal or homicidal ideations. R. 482.  Dr. Reddy diagnosed Durbin with fairly stable bipolar mood disorder.  R. 482.

---

[3] Mental health care providers assigned GAF scores in the past to rate a person's ability to function at a specific point in time.  The American Psychiatric Association no longer recommends using the GAF scale. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16-17.

On January 14, 2011, Durbin saw Dr. Reddy.  Durbin reported he was feeling "good" and sleeping well.  R. 484.  Durbin reported that he had increased panic attacks after a decrease in his dosage of Geodon.  He returned to his prior dosage. R. 484.

On February 14, 2011, Durbin saw Dr. Reddy.  Durbin reported he was doing well.  He reported he was sleeping wonderfully and the meds were doing well.  Durbin sometimes took an extra Lorazepam to get by. R. 485.

On May 16, 2011, Durbin saw Dr. Kiel.  Durbin reported "experiencing seizure episodes again," with the last one occurring on May 10, 2011. Durbin reported that he lost consciousness and had a bad memory for the rest of the day.  Dr. Kiel noted the increasing return of such seizures over the past three months and further noted that Durbin was not driving. R. 499.

On May 23, 2011, Dr. Reddy completed a Social Security Administration Listing of Impairments form.  Dr. Reddy opined that Durbin met Listing 11.03, non-convulsive epilepsy.  Dr. Reddy opined that Durbin met the Listing due to severe refractory PTSD, depression and seizure disorder.  R. 476.

On June 15, 2011, Durbin saw Dr. Kiel. Durbin reported having recurrent spells in which he was lethargic but able to answer questions in a sluggish manner. Durbin reported that he was having the spells "0 to 3 times a day." R. 497. Dr. Kiel noted that the seizures were refractory to multiple anticonvulsants. Dr. Kiel noted an assumption that they might be partial-complex seizures. R. 497.

On June 20, 2011, Durbin saw Dr. Reddy. Durbin reported he was doing well and feeling good on his meds. Durbin did not want any changes. He reported no side effects. R. 487.

On July 11, 2011, Durbin saw Dr. Kiel. Dr. Kiel noted that Durbin still had seizures two to three times a week. R. 495. Durbin reported that the seizures occurred at rest and with walking. He described them as being like "drop attacks." R. 495. He said he had generalized shaking after each seizure. He said the seizures wore him out. Dr. Kiel stated that this was "a sleep disorder more than anything else," and referred Durbin to the Washington University Neurology for testing. R. 495.

On August 31, 2011, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. The ALJ presided over the hearing from Peoria. Durbin appeared by videoconference from Springfield. Durbin was

represented by counsel at the hearing.  Vocational expert Ronald Malik also appeared at the hearing.  Durbin and Malik testified at the hearing. R. 12.

Durbin testified first at the hearing.  Durbin testified that he was divorced, his children were grown, and he lived with his mother in a house. At the time of the hearing, Durbin's son was 22 years old, and his daughter was 18 years old.  R. 55.  Durbin testified that he had not driven a car in three years.  He testified that Dr. Fortin put a restriction on his driver's license that kept him from driving. R. 33.  He testified that his mother or his son drove him around for errands. R. 33.

Durbin testified that he stopped working on December 23, 2002. Durbin testified he was involved in a rollover accident at work with a sprayer and was severely injured.  He started suffering from PTSD, panic attacks, and seizures after that incident.  R. 36.  He went back to work for 30 to 40 days but could not continue.  Durbin testified that his boss told him he needed to get his seizures and panic attacks under control before he came back to work. R. 38.

Durbin testified that his panic attacks felt like a heart attack, "I get real tight in my chest, and real shaky, and trembly, and it's just severe pain, and my blood pressure shoots sky high, and I just – that's kind of explaining it,

you know." R. 39.  Durbin testified that his panic attacks lasted ten to twenty minutes.  R. 39.  Durbin testified that he took medication for his panic attacks.  He testified that at the time of the hearing he had only a few panic attacks, "one every here and there on the panic attacks now."  R. 40.

Durbin testified that he started having seizures in October 2002.  He said he started having them four to five times a week.  He testified that he had been on several different types of medication for seizures.  He testified that at the time of the hearing he was still having three to four seizures a week.  R. 41-42.

Durbin testified that during his seizures he would blackout and collapse and then start trembling, shaking, and sweating.  He testified that the seizure lasted thirty seconds to a minute. He testified that he needed, "a few hours afterwards to get my bearings back to where I can focus on, you know, what's going on in the room, and understand things, you know. It takes a couple hours."  R. 42-43.  Durbin testified that he also felt tingling in his fingers and arms and had some dizziness after each seizure.  R. 43.

Durbin testified that his PTSD caused him to be "extremely claustrophobic." R. 44. He testified that he could not go out into crowds or into crowded restaurants.  He tried to shop when stores were not crowded. He testified that music also made him nervous as a result of his PTSD.

R. 44-45.  He also testified that he suffered from nightmares.  He said he had one or two nightmares a week.  R. 45.

Durbin testified that he helped with the laundry and washing dishes in his home.  He also took out the trash.  He testified he did not cook. He testified that once while he was cooking he had a seizure and pulled a skillet off of the stove on top of himself.  R. 47.  Durbin testified that he did not mow the yard.  R. 47.

Durbin testified that he became nervous if he was left alone for long periods of time.  He testified that he could stay alone for about three hours before he would start getting anxious.  Durbin's mother worked regularly from 7:00 a.m. to 1:00 p.m. Monday through Friday.  Durbin testified that his uncle would come and sit with him while she was away at work.  Durbin testified that his son would come on days when his uncle could not make it. Durbin's uncle was retired.  Durbin's son worked nights.  R. 50-51.

Durbin produced calendars in which he kept a record of his seizures. He put an X on the days when he had a seizure.  If he had more than one seizure in a day, he wrote down the number of seizures on that day.  R. 48. The ALJ questioned Durbin about the calendars:

> Q      I guess the calendars kind of confuse me, because it
> doesn't look like that Dr. Redi's (sic) progress notes indicated
> that you're having seizures that frequently.

A     Oh yeah.

Q     Okay – even thought (sic) his progress notes don't note it, you're still, you still they happened that frequently? Have you talked to Dr. Redi (sic) about how frequently they happened?

A     Yes, I've told him.

R. 51. Durbin testified that his depression was well-controlled by his medication. R. 52.

Durbin testified that in a typical day he woke up between 5:30 and 6:00 a.m. Durbin visited with his mother while she got ready to go to work. After she left, he did household tasks such as washing dishes, starting a load of laundry, or taking out the trash. He then visited with his uncle. After his uncle left, Durbin did other housekeeping tasks. On nice days, he sat in the yard in a chair. He watched TV in the evening. He testified that a seizure could disrupt any of these activities. R. 52-53.

Durbin testified that he could dress himself and take care of his personal hygiene; however, he could not take a shower unless all of the doors were open and the shower door was open because of his claustrophobia. R. 54.

Durbin testified that he did not have any hobbies. He testified he visited with friends periodically. He went out to the movies or to dinner occasionally with a woman friend. R. 54-55. Durbin testified that he raised

his two children after his divorce. He testified that his seizures and panic

attacks had interfered with his ability to attend school functions when his

children were younger. R. 55.

Vocational expert Malik then testified. The ALJ asked Malik a series

of hypothetical questions. In the first question, the ALJ asked:

> Initially, I'd like you to assume that we do have an individual
> that's the same age that the claimant is, so this individual is
> currently 46. The individual has the same education that the
> claimant has, which is at least a high school education, and this
> individual has the same work experience that the claimant has.
> Additionally I'd like for you to assume that this individual doesn't
> have any exertional limitations, but should be – should never
> climb ladders, ropes, or scaffolds. The individual should avoid
> concentrated exposure to dangerous moving machinery and
> unprotected heights. Given those limitations, would such an
> individual be able to return to any of the claimant's past jobs?

R. 58. Malik said that such a person could not perform Durbin's past

relevant work, but could perform other jobs in the national economy,

including the jobs of a marker and a router. R. 58.

The ALJ then asked Malik:

> If I change the hypothetical and I add to it that the individual
> would need to be in an environment that's fairly low stress in
> nature, so that there is no more than occasional decision-
> making or changes in the work setting, and by that I mean that
> every day, when the individual goes to work, they're going to
> know what those tasks are, going to be unchanging; and the
> environment additionally should be free of fast paced
> production requirements. Although there would be a production
> expectation by the end of the shift of the day, there wouldn't be

hourly production quotas, how does that affect the individual's
ability to perform those jobs?

R. 59.  Malik opined that the individual could still do the marker and router

jobs.  R. 59.

The ALJ then added:

And if I add in with that also, that the individual should also
have no more than occasional contact with the general public,
coworkers, or supervisors, does that affect those jobs?

R. 59.  Malik opined that the additional limitation would eliminate the router

job but not the marker job.  Malik further opined that the hypothetical

individual could perform the job of a cleaner.   R. 59.  Malik testified that the

cleaner is considered a light exertional job.  R. 59.

The ALJ then asked:

If I change the hypothetical again, and I add to it that the
individual would likely incur absences up to one day a week, up
to four days a month, due to seizure activity; an inability to
show up for work one day a week, up to four days a month,
how does that affect those jobs identified?

R. 60.  Malik opined that such a person could not perform any of the jobs

he listed.  R. 60.

The ALJ then asked:

And if an individual – if I alter that just a little bit, and say the
individual is able to show up for work, but on average of two
days a month, the individual may experience a seizure at work,
and have to either leave work early, or show up – maybe they
had a seizure at home and they had to show up late; so two

days a week they are either going to have to leave early, or
show up late for work, how – and that's going to be on a
regular, continuing basis – how would that affect the individual's
ability to maintain those jobs?

R. 60-61. Malik opined that the person could still perform the jobs unless

the individual would have to arrive an hour or more late to work, or leave

work an hour or more early. R. 61. Malik testified that his opinions were

consistent with the Dictionary of Occupational Titles. The hearing then

concluded.

<u>THE DECISION OF THE ALJ</u>

On September 13, 2011, the ALJ issued her decision. R. 12-22. The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2

requires the claimant to have a severe impairment. 20 C.F.R. §§

404.1520(c), 416.920(c). If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education and work experience. 20 C.F.R. §§ 404.1520(d),

416.920(d). To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of a Listing. If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Durbin had met his burden at Steps 1 and 2. He had not engaged in any substantial gainful activity since December 17, 2004, and he suffered from severe impairments consisting of a seizure disorder, anxiety disorder with panic attacks, PTSD, and obesity. R. 14.

At Step 3, the ALJ found that Durbin's impairments or combination of impairments did not meet or equal any Listing. R. 15. The ALJ specifically considered the Listing for epilepsy, Listing 11.03. The ALJ noted that the Listing 11.03 required that the seizures must be "documented by detailed

description of a typical seizure pattern including all associated phenomena; occurring more frequently than once weekly, in spite of at least three months of prescribed treatment."  R. 15. See Listing 11.03.  No such documentation existed in the records submitted to the ALJ.

The ALJ later, in her decision, specifically rejected Dr. Reddy's opinion that Durbin met Listing 11.03.  R. 19.  The ALJ found that Dr. Reddy's opinion was inconsistent with, "Dr. Reddy's treatment record as well as the claimant's longitudinal medical record."  R. 19.  The ALJ continued, "In summary, Dr. Reddy's own treatment notes continually showed claimant progressing well and does not document any frequency of the claimants allege seizure disorder."  R. 19 (citation to the record omitted).

The ALJ also specifically considered Listing 12.04 for affective disorders, and Listing 12.06 for mood disorders.  With respect to Paragraph B of each of these Listings, the ALJ found that Durbin had mild restrictions on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties with regard to concentration, persistence or pace; and no evidence of any episodes of decompensation of extended duration.  The ALJ also found no evidence that Durbin ever was so severely affected by his conditions as to meet any of the requirements of

Paragraph C of Listings 12.04 and 12.06.  R. 16.  The ALJ relied primarily on Durbin's March 21, 2010, Function Report.  R. 16.  The ALJ nowhere mentioned Dr. Reddy's opinions that Durbin met the requirements of Paragraphs B and C in these two Listings.  R. 16-17.

At Step 4, the ALJ found that Durbin had the RFC to perform light work except that he could never climb ladders, ropes, or scaffolds and had to avoid concentrated exposure to dangerous machinery and unprotected heights.  The ALJ further found that due to his mental limitations, Durbin needed to have a low stress work environment free of fast-paced production requirements with no more than occasional contact with the public, coworkers, or supervisors.  R. 17.  The ALJ then found that Durbin could not return to his prior work based on his RFC.  The ALJ relied on the opinions of vocational expert Malik.

At Step 5, the ALJ found that Durbin could perform a large number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Malik that a person with Durbin's RFC, age, work experience, and education could perform the jobs of cleaner and marker.  The ALJ then concluded that Durbin was not disabled.  R. 21.

Durbin appealed the decision of the ALJ. On October 18, 2012, the Commissioner's Appeals Council denied Durbin's request for review. The ALJ's decision then became the decision of the Commissioner. R. 1. Durbin then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. In making this review, the Court considers the evidence that was before the ALJ. Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case the ALJ failed to minimally articulate her analysis of Dr. Reddy's opinions that Durbin met the Listings 12.04 and 12.06.[4] Dr. Reddy's opinions that Durbin met these Listings were clearly material. Dr. Reddy treated Durbin. The opinions of a treating physician regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The ALJ's finding at Step 3 that Durbin did not meet Listings 12.04 or 12.06 was directly contrary to Dr. Reddy's opinions. The ALJ needed to explain why she rejected Dr. Reddy's opinions regarding these Listings. See e.g., Zurawski v. Halter, 245 F.3d 881, 888-89 (7th Cir. 2001) (ALJ must minimally articulate her analysis of the evidence "to permit an informed review."). The ALJ, however, never even mentioned Dr. Reddy's opinions regarding these Listings.

The ALJ understood the importance of addressing Dr. Reddy's opinions. The ALJ expressly rejected Dr. Reddy's opinion that Durbin met Listing 11.03. The ALJ's decision to reject Dr. Reddy's opinion regarding Listing 11.03 was supported by substantial evidence. The record did not contain the documentation of Durbin's seizures after three months of

---

[4] Dr. Reddy expressly opined that Durbin met Listing 12.04. Dr. Reddy's other opinions on the Psychiatric Review Technique form would also establish that Durbin met Listing 12.06.

treatment required by the Listing. Durbin's arguments to the contrary are not persuasive.

This ALJ, however, failed to address Dr. Reddy's opinions concerning Listings 12.04 and 12.06. She therefore failed to minimally articulate her analysis of all the material relevant evidence. Herron v. Shalala, 19 F.3d at 333. The case should be remanded so that the ALJ can explain her analysis of these opinions.

The Commissioner argues that the ALJ was not bound by Dr. Reddy's opinions regarding Listings 12.04 and 12.06. The Commissioner argues that Dr. Reddy's opinions were extreme and not supported by the record. Commissioner's Memorandum in support of Motion for Summary Affirmance (d/e 12), at 14-15. The ALJ should decide whether Dr. Reddy's opinions were extreme or whether they were supported by evidence in the record, not the Court. See Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) ("Because the Commissioner is responsible for weighing the evidence, resolving conflicts and making independent findings of fact, this Court may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." (citation

omitted)).  The case should be remanded so that the ALJ can set forth her analysis of the treating physician's opinions.

The Court notes that Durbin also challenges whether the ALJ adequately addressed Durbin's nonexertional limitations in her finding of his RFC.  The only error in the RFC finding is, again, a failure to address Dr. Reddy's opinions with respect to Listings 12.04 and 12.06.  The ALJ limited Durbin to light work with no exposure to hazards such as dangerous moving machinery or unprotected heights.  R. 17.  The limitation to light work accommodated Durbin's back problems.  Dr. Panepinto recommended the restrictions on exposure to hazards to address problems that could result from Durbin's seizure disorder.  Dr. Panepinto's opinion provided substantial evidence to support this part of the RFC.

The ALJ also limited Durbin to low stress work environments free of fast-paced production requirements with no more than occasional contact with the public, coworkers, or supervisors to address his mental limitations. R. 17.  This analysis is supported by Dr. Kuester's opinions, but not Dr. Reddy's opinion.  On remand, the ALJ must resolve this disagreement.

THEREFORE this Court recommends that Plaintiff's Motion for Summary Judgment (d/e 8) should be ALLOWED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 11)

should be DENIED.  The decision of the Commissioner should be reversed and remanded for further proceedings pursuant to 42 U.S.C. § 405(g) sentence four.   Plaintiff's second Motion for Summary Judgment (d/e 9) is incorrectly docketed as a separate motion.  Docket entry 9 is a correction of the original Motion (d/e 8).   The Clerk is directed to correct the docket to reflect the fact that docket entry 9 is not a motion.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   June 19, 2014


s/ Tom Schanzle-Haskins
UNITED STATES MAGISTRATE JUDGE